# SUPREME COURT.

## SOLON HOWLAND, appellant agt. JOHN B. COFFIN and eleven others, respondents.

1. Where a final judgment provides that the plaintiff recover of the defendants $42.05 damages without costs, and that the, defendants recover of the plaintiff $42.05 for costs and disbursements, and that said judgments offset or satisfy each other : It is appealable from, at the suit of the aggrieved party.
2. A contract to pay a broker five per cent commission for negotiating a charter of a vessel to the government, is not *per se* void on the ground that it contravenes public policy.
3. It must appear that the parties intended to make use of, or to resort to corruption or improper influences to obtain the charter, or that the undertaking was injuriously to affect or subvert public interests.
4. We are not to presume anything wrong in a transaction in which the government is concerned, any more than where private individuals are concerned.
5. Where the defendants, owners of a steamboat, contracted to pay the plaintiff, a broker, five per cent on amount of charter, obtained by him from the government for such steamboat ; that is to say, on $200 per diem, " more or less, as long as she remains in government service :" A reduction of the charter compensation from $200 to $120 per diem, without the consent or knowledge of the broker, by a simple indorsement on the charter party, without any other change in its provisions, the vessel continuing in the government employ, does not amount to a new charter, so as to deprive the broker of his right to compensation on the reduced amount. In such case, the identity of the instrument or the transaction is not affected by the indorsement, so as to deprive the broker of his compensation under the contract in suit. The vessel still, within the meaning of the contract, remained in the government service under the original charter.

*New York General Term. December* 1866.

Howland agt. Coffin.

*Before* G. G. BARNARD, *P. J.*, T. W. CLERKE *and* DANIEL P. INGRAHAM, *Justices.*

THIS was an appeal taken from a judgment entered on a verdict of a jury for $42.05. The claim was for $1,700, commissions at five per cent, for negotiating a charter for defendants (who were owners of the steamboat *Seth Low*) to the government, during the war.

The charter was for $200 a a day for thirty days, and for such longer time as the government should require her. It was dated April 15, 1862. Under it the boat continued in the service of the government until December 1, 1863, when an entirely new charter was made, about which the plaintiff made no claim. The plaintiff based his claim for commissions under the provisions of the following agreement, viz : " I hereby agree to pay to Solon Howland, on account, of his obtaining a charter from the government for the steamer Seth Low, five per cent on amount of charter—say $200 per diem, more or less—so long as she remains in government service."

The government paid the defendants $200 per day, up to March 25, 1863, when it reduced the per diem compensation to $120 per day, which was paid until December, 1863, the date the charter was made. All of the receipts prior to 1863, for the per diem compensation of the boat, were paid on the original charter of April 15, 1862. The owners of the vessel recognized the right of the master of the vessel to bind them to the plaintiff's compensation by the contract in question, and their clerk or treasurer regularly paid him five per cent on the charter money received by them, until March 25, 1863, when they refused to pay him any more, on the ground that the reduction by the government at the price from $200 to $120 per day, was in effect a new charter of the vessel at that price, from the time of the reduction.

The defendants received on the charter $98,920. They paid the plaintiff $3,390. He claimed the balance of the per centage, viz : $1,676.26.

Judge BOCKES, who presided on the trial below, held that under the contract, the charter of April 15, 1862, was ended

whenever the government reduced the compensation from $200 to $120 per day.

To this ruling the plaintiff's counsel excepted.

The plaintiff then requested the court to charge :

1st. That the plaintiff was entitled to recover five per cent on the amount of charter.moneys actually received or earned by the defendants from April 15th until December 1, 1863, the date of second charter. This the court refused, and plaintiff excepted.

2d. That the plaintiff was entitled to recover five per cent on $200 per day, from time steamer entered into service under charter party of April 15, 1862, until December 1, 1863. This was refused, and plaintiff excepted.

The plaintiff's counsel requested the court to rule that the indorsement reducing the price of charter from $200 per day unto $120 per day, amounted to nothing as concerned plaintiff, and he was entitled to recover five per cent on $200 a day for whole time. This was refused, and plaintiff excepted.

Under the direction of the court, in a charge corresponding with the above rulings, the jury found a verdict for the plaintiff for $42.05. To which directions the plaintiff again severally excepted.

The appellant proved that he did not consent to the reduction of the $120, nor had he any notice of it until just before suit commenced.

In entering judgment on this verdict, the judgment roll contained a provision awarding the plaintiff judgment for the $42.05, and then a further provision that the defendant recover of the plaintiff their costs, $42.05, and that judgments offset each other.

DENNIS McMAHON, *for the appellant.*

I. The reasonable construction of the contract under which the plaintiff claimed his commission, is :

1. An agreement to pay the plaintiff five per cent on the amount to be received by the respondents under the charter of April 15, 1862, whether it be $200 per diem, or more than

that amount, or less than that amount; otherwise to what do the words "more or less" refer?

2. To keep on paying to the plaintiff that amount of per centage as long as the vessel remained in government service; otherwise what is the meaning of the words "so long as she remains in government service?"

Any other construction, we maintain, was erroneous, and the court below therefore erred in their rulings, and the plaintiff was entitled to recover his full claim. When a clause is capable of two significations, it should be understood in that which will have some operation, rather than in that in which it will have none (*Archibald* agt. *Thomas,* 3 *Cow.* 284).

The whole covenant is to be taken together, and if the intention of the parties be doubtful, that construction is to be adopted which is most beneficial to the covenantee (*Marvin* agt. *Stone,* 2 *Cow.* 781).

II. The circumstances surrounding the contract at and subsequent to the execution and duration, give effect to our construction of the contract, and prove the error of the court below.

1. The commissions agreed to be paid to the plaintiff were actually one half of the usual commissions in such cases.

2. The charter of the 15th of April, 1862, was a charter *for thirty days, and as much longer as her services may be required,* to be used as a tug or transport in Chesapeake Bay, where she must proceed with all practicable dispatch, and such other place or places as she may be required, &c.

Thus showing that all parties contemplated that the government would keep her longer than the chartered term.

3. By the charter, it is further provided that at its expiration the steamer shall be returned to New York, and compensation should cease when she should be so returned. Thus showing that the parties contemplated that the vessel would be in government employ under that charter for a longer period than the thirty days. She was not returned to New York until the new charter was made.

4. She was in fact in the government employ without any

new charter from April 15th, 1862, until December 1st, 1863, when a new charter was made out, for the commissions under which no claim is made.

The only change in the old charter in the meantime being a reduction of the $200 per day to $120 per day.

5. The parties: viz ; the government and the owners of the boat, notwithstanding the reduction; considered they were acting under the charter of April 15, 1862, up to December 1, 1863.

All the defendants bills and receipts were made out up to December 1, 1863, under the original charter of April 15, 1862. Also the certificates of payment indorsed.

In construing a written instrument it is proper to look at all the surrounding circumstances, and the pre-existing relations between the parties (*Blossom* agt. *Griffin,* 13 *N. Y. R.* 569).

III. The reduction of the chartered price of the steamboat in question, from $200 to $120, was not such a new charter of the boat as would defeat the plaintiff's claim to his commissions ; for,

*(a)* It was done by a mere indorsement on the charter of April 15, 1862.

*(b)* This indorsement was done without the knowledge or consent of the plaintiff.

*(c)* It did not in any way affect the other provisions of the charter of April 15, 1862, nor was it intended so to do, between the parties, excepting in the single case of the amount ; as both sides acted under the original charter in every other respect, from that time until the new charter of December 1, 1863, was made up.

*(d)* The words " more or less," contained in the contract on which the plaintiff sued, contemplated that the right to his commissions would exist notwithstanding any such reduction ; even if it did not, the owners of the vessel could not make such an indorsement without the plaintiff's knowledge or consent, and thereby deprive him of his right to his commissions. If they could, in the face of the provisions of the contract on which he sued, they could do so by the slightest

diminution in the amount of the chartered price, at any time after it was made.

*(e)* The charter itself was under seal; the indorsement was by parol (15 *Wend.* 400). To give effect to the indorsement amounting to a new charter; it must appear that the parties intended a surrender of the original charter in all its parts and provisions, not a mere reduction of the per diem.

A broker is entitled to his commissions where he brings about a bargain, charter or sale, and when a contract is entered into, the parties to it cannot afterwards, by agreement between themselves, withdraw the matter from the broker's hands, and deprive him of his commissions. (*Wilkinson* agt. *Martin,* 8 *Carr. & P. p.* 3 ; *Chitty on Con. O. P.* 547 ; *Hosford* agt. *Wilson,* 1 *Taunt. p.* 12.)

*Fourth.* The court below erred in refusing to rule that the indorsement on the charter of April 15, 1862, reducing the price, amounted to nothing as concerns the plaintiff, and that the plaintiff was entitled to five per cent on $200 a day for the whole time.

GILBERT DEAN, *for respondents.*

I. There is no judgment appealed from. This court has no jurisdiction.

The award of judgment provides that the judgment for the appellant for $42.05, and for the respondents for $42.05 for costs, should respectively offset each other. The judgments therefore satisfied each other, and there was no judgment to appeal from.

II. If there is a judgment, then the agreement becomes material. That agreement is limited to "a charter," and the commissions are limited to *the charter* obtained by him ; that is, "five per cent on account of charter," not charters.

*(a)* The claim of the plaintiff is, that the words "so long as she remains in government service," do not relate to this contract or charter, but that the vessel was mortgaged to the plaintiff for all time.

*(b)* On the 25th March, 1863, a reduction in price was

made to $120 per day. This was in Washington, and plaintiff had nothing to do with it.

(c) A new charter party was made in December, 1863, containing different provisions; one as to the value of the vessel; and it was agreed that it should take effect from April 1, 1863.

(d) Owners objected to making this new charter party. Government took the first one, considering it as closed.

III. The judge decided rightly in holding that the charter ended when a new measure of compensation was agreed upon, and that between the captain, who was a part owner, and the government, without the intervention of the plaintiff. The judgment should be affirmed.

IV. The contract for the plaintiff's commissions was contra bonos mores (American Tool Co. agt. Norris, 2 Wallace's U. S. Sup. C. Rep. 45).

DENNIS McMAHON, in reply.

I. Even were the respective awards of judgment in this case considered as satisfying each other, yet such satisfaction is made under the direction of the court, which is appealed from. It is not a voluntary satisfaction on the part of the appellant.

II. The case of American Tool Co. agt. Norris (2 Wallace's Rep. p. 45), does not apply to this case, for in that one it was the partnership interest of Norris in the government contract awarded to the American Tool Co., which shocked the legal sense of the court. The government was defrauded by the extraordinary compensation paid. In the case at bar, it is simply one of a broker seeking to get a bona fide commission for negotiating a charter, at a rate which is shown to be one half the usual commission in such cases.

The case of Sedgwick agt. Stanton (14 N. Y. R. p. 289), displays the true rule; also Mills agt. Mills (36 Barb. p. 474).

By the court, CLERKE, J. I. The respondents' counsel makes a point that there is no judgment in this case, and,

therefore, nothing to appeal from. The final order provides that the plaintiff recover of the defendants $42.05 damages, without costs, and that the defendants recover of the plaintiff $42.05 for costs and disbursements, and that the said judgments offset each other. Thus they neutralize each other; but does it follow that there is no judgment? This order is something; it is a decision—a final decision—and what can that be but a judgment? The respondents' counsel is not correct, therefore, in saying there is nothing to appeal from. There is something, and that something must be deemed nothing else than a judgment—a judgment by which the plaintiff considers he has suffered wrong, and which he maintains is erroneous. The right of appeal could be effectually destroyed in many cases by a judge, if an arrangement of this nature should have the effect claimed by the defendants' counsel. A judgment, whatever may be its provisions, is the final determination of the rights of the · parties (*Code*, § 245).

II. I do not think that the contract upon which the plaintiff sues is void on the ground that it contravenes public policy. *Sedgwick* agt. *Stanton* (14 *N. Y. R.* 289), gives us the law very distinctly on this point. Contracts illegal' at common law, as being contrary to public policy, are those which injuriously affect or subvert the public interest. By the written contract in the case above referred to, the assignor of the plaintiff undertook to obtain, at his own expense, from the state for Stanton, a title to a lot in Syracuse, which Stanton then occupied and used for a store-yard, for which service Stanton agreed to convey, when the title should be obtained, one undivided half of the said lot. It was held that no public interest was violated in the performance of this contract. Its purpose was to induce the commissioners of the land office to act upon the question of Stanton's preemptive right to the lot. It was declared valid, and the judgment against Stanton was affirmed.

In *Mills* agt. *Mills* (36 *Barb.* 474), the agreement was to convey land to another upon the consideration that the latter would give all the aid in his power, spend his time and

use his utmost influence and exertions to procure the passage of a law pending before the legislature, granting authority to the covenantor to construct a rail track for the running of cars on Division avenue, Williamsburgh. In the language of the justice who delivered the opinion in this case, " the plaintiff was not employed as he lawfully might be to prosecute a private claim, nor to collect information, prepare statements and furnish arguments freely and openly to a legislative committee, in favor of any public measure which might incidentally benefit individuals ;" but he was to use such exertions and influences covertly, as have done so much to corrupt the public morals and impair the public virtue of the state and nation. It was held, that although some of the other considerations mentioned in the agreement were unexceptionable, it was nevertheless void, on account of the provisions to which I have referred.

In the case before us, the defendants agreed to pay the plaintiff a certain commission for obtaining a charter from the United States government for their steamship. We are not to presume necessarily, because this was a charter to be obtained from the government, that any corruption or improper influences were to be resorted to, or that the undertaking was injuriously to affect or subvert the public interest. We are not to presume anything wrong in a transaction in which the government is concerned, any more than where private individuals are alone concerned. The plaintiff had as good a right to obtain a charter of this kind for any other person, as he would have to obtain one for himself. If the defendants thought it best to employ an agent to procure this charter, who, perhaps, possessed better tact at, and had more time to devote to this business, they had a perfect right to do so, and by doing so were not doing anything necessarily detrimental to the public interests, the contract then is valid.

III. How far are the defendants made liable by it? They promised to pay the plaintiff five per cent on amount of charter, say $200 per diem, more or less, so long as the

vessel shall remain in government service. The charter was obtained by the agency of the plaintiff, and the government paid defendants $200 per diem until. March 25, 1863, when it reduced the per diem compensation to $120. The defendants admitted that they were bound to pay the commissions to March 25, 1863, but as the compensation was reduced on that day, they maintain the charter which the plaintiff obtained ceased to exist, and from that day he is entitled to no commission. But the precise instrument on which the charter was written, was retained between the defendants and the government. Nothing was altered; not a single provision struck out or modified; the only change related to the compensation, and that was merely indorsed upon the instrument. This instrument was dated the 15th of April, 1862; it was of considerable length; contained numerous provisions; is very specific; is very carefully prepared, and is, as I have said, retained by the defendants and the government, as the compact by which they are to be governed during the continued employment of the vessel by the latter. They both, however, seem to think that circumstances render it proper that the compensation should be reduced, and they signify this opinion by an indorsement on this same instrument. In every other respect, not in the least degree, is a single sentence or word altered, and, in the words of the agreement, "the vessel remained in government service." The indorsement, in my opinion, has not affected the identity of the instrument or the transaction; and the defendants are liable for a commission of five ·per cent on $200 per diem to March 25, 1863, and on $120 per diem from that date to December 1, 1863.

The judgment should be reversed.

New trial ordered, costs to abide event.